# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NICKOLAS SUK<br>207 Allendale Drive<br>Morrisville, PA 19067 | : : : : | CIVIL ACTION |
| Plaintiff,<br>v. | : : : | CASE NO.: |
| THE TRUSTEES OF PRINCETON<br>UNIVERSITY d/b/a PRINCETON<br>UNIVERSITY<br>701 Carnegie Center, Suite 442<br>Princeton, NJ 08544 | : : : : : : | |
| Defendant. | : : | |

## CIVIL ACTION COMPLAINT

Nickolas Suk (hereinafter referred to as "Plaintiff"), by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1. This action has been initiated by Plaintiff against The Trustees of Princeton University d/b/a Princeton University (hereinafter collectively referred to as "Defendant") for violations of the Americans with Disabilities Act, as amended ("ADA" - 42 USC §§ 12101, *et. seq.*), the New Jersey Law Against Discrimination ("NJ LAD"), the Family Medical Leave Act ("FMLA" – 29 U.S.C. § 2601 *et. seq.*), and the New Jersey Family Leave Act ("NJ FLA"). Plaintiff asserts, *inter alia*, that he experienced unlawful workplace discrimination and retaliation, culminating in his termination from Defendant. As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2. Plaintiff resides in and is a citizen of Pennsylvania.

3. Upon information and belief, Defendant The Trustees of Princeton University d/b/a Princeton University is incorporated under the laws of New Jersey with headquarters and/or principal place of business in the same, rendering it a citizen of New Jersey.

4. This Court, in accordance with 28 U.S.C. § 1332, has jurisdiction over Plaintiff's claims because there is complete diversity jurisdiction, as Plaintiff is a citizen of Pennsylvania, and Defendant is a citizen of New Jersey, and the amount in controversy exceeds $75,000.

5. This Court also has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§1331 and 1343(a)(4) because it arises under laws of the United States and seeks redress for civil rights violations under the ADA. There lies supplemental and/or ancillary jurisdiction over Plaintiff's future state-law claims, as they arise out of the same common nucleus of operative fact(s) as Plaintiff's federal claims asserted herein.

6. This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945), and its progeny.

7. Pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

8. Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff has properly exhausted his

administrative proceedings before initiating this action by timely filing his Charge with the EEOC, and by filing the instant lawsuit within 90 days of receiving a right-to-sue letter from the EEOC.

## PARTIES

9. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

10. Plaintiff is an adult individual, with an address as set forth in the above caption.

11. Defendant The Trustees of Princeton University d/b/a Princeton University, is a non-profit New Jersey Corporation and private, Ivy League research university, headquartered at the above-captioned address.

12. At all times relevant herein, Defendant acted by and through its agents, servants and/or employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

13. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

14. Plaintiff worked for Defendant for approximately one year, from in or about May of 2024, until his unlawful termination (discussed further *infra*) on or about April 5, 2025.

15. Plaintiff was originally hired by a temp agency and placed to work within Defendant on or about May 20, 2024, but then became a full-time direct employee of Defendant on or about February 17, 2025.

16. Plaintiff was employed by Defendant as an Animal Care Technician I ("Cage Wash Technician") in the Laboratory Animal Resources ("LAR") department.

17. Plaintiff was primarily supervised by Defendant's LAR Facility Manager, Brian Ludwig (hereinafter "Ludwig") and generally supervised by Defendant's LAR Associate Director, Susie Chow (hereinafter "Chow").

18. Before becoming a full-time direct employee of Defendant, Plaintiff was supervised by Defendant's Supervisor, Caroline Diordano (hereinafter "Diordano").

19. In or about February of 2025, when Plaintiff was interviewed to become a full-time direct employee of Defendant, Plaintiff informed the interviewers and specifically Diordano that his wife was pregnant with his first child due in April of 2025, and he wished to have a job with benefits and eligibility to take paternity leave following the birth of his child.

20. He informed Diordano that if he was not yet eligible for paid and/or protected leave (FMLA and NJ FLA qualifying) when his child was born, he would be taking unpaid and/or unprotected leave until he was eligible. Regardless, Plaintiff put Defendant on notice of his intent to take paternity leave following the birth of his child.

21. Throughout Plaintiff's employment with Defendant, he was a hard-working employee who performed his job well.

22. On or about March 1, 2025, Plaintiff suffered serious injuries to his leg/knee as a result of a skiing accident outside of work.

23. On or about March 2, 2025, Plaintiff was treated at urgent care and was advised to follow-up with an orthopedic surgeon.

24. As a result of his aforesaid serious health conditions, Plaintiff suffered from pain, stiffness, and mobility issues, which (at times) limited his ability to perform some daily life activities, such as walking, heavy lifting, and working (among other daily life activities).

25. Despite his aforesaid health conditions and limitations, Plaintiff was able to perform his job duties well; however, he (at times) required some reasonable medical accommodations.

26. For example, immediately following his evaluation at urgent care, Plaintiff's doctor recommended and Plaintiff commenced an approximate 1-week medical leave to care for and treat his serious health conditions as he was unable to put any pressure on his knee/leg (a very reasonable accommodation under the ADA).

27. Following his brief 1-week medical leave, Plaintiff returned to work on or about March 10, 2025, in pain, wearing a brace under his pants, and with temporary restrictions of limiting his walking, sitting as needed, and no heavy lifting.

28. Plaintiff informed management and Human Resources ("HR") that he would provide them with updates as he received them from his doctor, including MRI results.

29. On or about March 21, 2025, Plaintiff informed Defendant's Manager, Faculty and Staff Accommodations, Office of HR, Sherrie Borowsky (hereinafter "Borowsky") that he had a torn ACL and required temporary light-duty limitations of no lifting over 10 (ten) pounds and breaks as need to rest his leg/knee.

30. Nonetheless, during this same timeframe, on or about March 22, 2025, Defendant was preparing for an inspection of its facilities, and Plaintiff was tasked with substantially more work and more hours, and Defendant required him to work against his restrictions.

31. Specifically, Plaintiff was not permitted to sit when needed, and Defendant required Plaintiff to lift over 10 (ten) pounds, causing him to suffer increased pain and mobility issues in his leg/knee.

32. Plaintiff complained to Defendant's management and requested help, after which he was initially provided with Defendant's PRR Lead Animal Care Technician, Juan Mercardo (hereinafter "Mercardo") on or about March 22, 2025, who was not helpful, had a poor attitude towards Plaintiff, and was placing things in the way of Plaintiff which required him to perform additional laborious work that exacerbated his aforesaid health conditions.

33. Additional Plaintiff avers that on or about March 22, 2025, Mercardo simply sprayed some cages and walked away.

34. As a result of the pain and lack of help Plaintiff received that day, he was short with Mercardo and his lack of assistance/laziness but never yelled, threatened, or became aggressive with him.

35. Then, on or about March 25, 2025, while still being required to work against his medical restrictions, Plaintiff was asked to train another Cage Wash Technician, Marcus Jones (hereinafter "Jones") who showed up to work 30 (thirty) minutes before Plaintiff but was not doing any work and just standing around when Plaintiff arrived.

36. When Plaintiff frustratingly inquired as to why Jones was not doing any work, Jones, offensively and without permission, placed his hand on Plaintiff's chest, to which Plaintiff objected that touching him was inappropriate and unwelcome, and then Plaintiff walked away.

37. Despite that Defendant then passed inspection, during a very stressful and frustrating time for everyone involved (as management had been terse as well), Plaintiff was then called into a meeting by Ludwig and Diordano, later that same day (March 25, 2025), wherein Ludwig addressed the aforementioned incident with Jones and asked for Plaintiff's version of events.

38. In that same meeting, Plaintiff was specifically informed by Ludwig that Jones wanted to move past the incident, had been warned about physical touching, and that Plaintiff should try to move past the incident as well – which Plaintiff was more than willing to do.

39. Nonetheless, in an attempt to intimidate Plaintiff, Ludwig informed him that "all I have to do is inform HR that I don't need you anymore," and both Plaintiff and Jones would be terminated. But Ludwig then backtracked and ensured Plaintiff that the March 25, 2025, incident was in the past.

40. Surprisingly, then on or about March 27, 2025, HR called Plaintiff to inform him that he was being placed on a paid suspension, pending investigation into the alleged incidents with the aforementioned employees (*see* Paragraphs 32-36, *supra*).

41. Thereafter, on or about April 1, 2025, Plaintiff was interviewed by Defendant's HR Director of Client Services and Academic Administration, Lisa Baratta (hereinafter "Baratta") wherein Plaintiff informed Baratta that he had simply been in pain and frustrated with the lack of help during the inspection period, during which Plaintiff was not accommodated, and the employees in question were not assisting or performing their job duties.

42. Plaintiff clarified to Baratta, however, that at no time did he yell, scream, or act aggressively towards the aforementioned employees and that, in fact, Jones had physically and without permission touched Plaintiff in violation of Defendant's code of conduct policies.

43. Notwithstanding the same, the following day, on or about April 2, 2025, Baratta called to abruptly terminate Plaintiff's employment.

44. Plaintiff was completely surprised by this decision as he had already been advised on March 25, 2025, that the incident with Jones was in the past.

45.     Additionally, upon information and belief, Mercardo and Jones both still work for Defendant despite the fact that both employees were not performing their job duties, and Jones became physical with Plaintiff.

46.     Most tellingly ,in very close proximity to his abrupt termination, Defendant's management knew, upon review of paperwork provided by his doctor, that Plaintiff potentially needed time off for surgery for his leg/knee and that he was about to take time off for paternity leave for the birth of his first child, in or about the third week of April of 2025 – both of which would have become FMLA and NJ FLA qualifying leave on or about May 20, 2025 (less than four weeks later).[1]

47.     As a result, Plaintiff believes and therefore avers that he was also terminated in part because Defendant wanted to avoid having to accommodate Plaintiff's future medical and/or paternity leave pursuant to the FMLA and NJ FLA.[2]

---

[1] *Meky v. Jetson Specialty Mktg. Servs.*, No. 5:16-cv-1020, 2017 U.S. Dist. LEXIS 31007, at *25 (E.D. Pa. Mar. 6, 2017)(collecting cases)("the time an employee spent working for an employer through a temporary agency is tacked on to the time spent working as a permanent employee in determining when the employee is eligible for FMLA benefits").  Moreover, pursuant to 29 C.F.R. § 825.106(b)(1), "joint employment will ordinarily be found to exist when a temporary or leasing agency supplies employees to a second employer." As such, "[e]mployees jointly employed by two employers must be counted by both employers, whether or not maintained on one employer's payroll, in determining employer coverage and employee eligibility...." 29 C.F.R. § 825.106(d). For FMLA eligibility purposes, an employee's term of employment begins once assigned by the temporary agency, rather than when hired as a permanent employee. *Miller v. Defiance Metal Products, Inc.*, 989 F. Supp. 945, 947-48 (N.D. Ohio 1997).

[2] Courts have held that the FMLA is designed to protect "pre-eligible" employees, and an employer can be held liable under FMLA for interference and/or retaliation when an employee makes his or her intent to take future FMLA leave, even if the employee was not eligible when he or she made the request. *See Sine v. Rockhill Mennonite Home*, 275 F. Supp. 3d 538, 543-44 (E.D. Pa. 2017)(holding that the FMLA protects "a pre-eligible employee who provides notice of intent to take future FMLA leave."); *see also Pereda v. Brookdale Senior Living Cmtys., Inc.*, 666 F.3d 1269, 1274-75 (11th Cir. 2012)(holding an employee's FMLA interference and retaliation claims should not be dismissed where an employee who prior to being eligible under the FMLA requested FMLA leave for the birth of her child that would commence after she was eligible because the FMLA protects pre-eligibility request for post-eligibility leave). In the instant case, Plaintiff clearly put Defendant on notice in or about February of 2025, that he would be taking leave following the birth of his child in or about April of 2025, and would just take unpaid leave until he became eligible for the full protection and benefits protected and/or paid leave.

48. Plaintiff further believes and therefore avers that he was subjected to discrimination, a hostile work environment, and retaliation because of: (1) his actual/perceived/record of disabilities; (2) his requested medical accommodations; and (3) Defendant's failure to properly accommodate Plaintiff's disabilities, by requiring Plaintiff to work against his restrictions and terminating him shortly after requesting/notifying Defendant of future paternity leave and/or medical leave for surgery.

49. Finally, Plaintiff believes and therefore avers that his serious medical conditions were motivating and/or determinative factors in the termination of his employment by Defendant.

**COUNT I**
**Violations of the Americans with Disabilities Act, as Amended ("ADA")**
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation;**
**[3] Hostile Work Environment; and [4] Failure to Accommodate)**

50. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

51. Plaintiff suffered from qualifying health conditions under the ADA which affected his ability (at times) to perform some daily life activities.

52. Plaintiff kept Defendant's management informed of his serious medical conditions and need for medical treatment and other accommodations.

53. Despite Plaintiff's aforementioned health conditions and limitations, he was still able to perform the duties of his job well with Defendant; however, Plaintiff did require some reasonable medical accommodations at times.

54. Plaintiff requested reasonable accommodations from Defendant including but not limited to limiting his walking, sitting as needed, no heavy lifting over 10 (ten) pounds, and breaks as need to rest his leg/knee.

55. Plaintiff was subjected to discrimination and a hostile work environment through disparate treatment and demeaning and/or derogatory treatment because of his aforesaid health conditions and requested accommodations.

56. Plaintiff was terminated from his employment with Defendant on or about April 2, 2025, for completely pretextual reasons.

57. Defendant failed to properly accommodate Plaintiff by requiring him to work against his doctor's recommended restrictions and terminating him to prevent him from taking ADA-qualifying medical leave in the future for surgery.

58. Plaintiff believes and therefore avers that he was subjected to discrimination, a hostile work environment and retaliation because of (1) his known and/or perceived disabilities; (2) his record of impairment; (3) his requested accommodations (discussed *supra*); and (4) Defendant's failure to properly accommodate Plaintiff's health conditions (set forth *supra*).

59. Plaintiff also believes and therefore avers that his disabilities were motivating and/or determinative factors in the termination of his employment by Defendant.

60. These actions as aforesaid constitute violations of the ADA.

### COUNT II
### Violations of the New Jersey Law Against Discrimination ("NJ LAD")
([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3] Hostile Work Environment; & [4] Failure to Accommodate)

61. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

62. Plaintiff reasserts each and every allegation from Count I, as such actions in this case constitute identical violations of the NJ LAD.

## COUNT III
### Violations of the Family and Medical Leave Act ("FMLA")
### ([1] Interference & [2] Retaliation)

63. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

64. Plaintiff would have been an eligible employee under the FMLA on or about May 20, 2025, under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

65. Plaintiff informed Defendant, his employer, that he intended to take leave once he had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

66. Plaintiff had (or would have had) at least 1,250 hours of service with Defendant at the time he would have become eligible for FMLA leave for the birth of his child on or about May 20, 2025, had he not been terminated.

67. Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

68. Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of leave on a block or intermittent basis.

69. Plaintiff was terminated in close proximity to his requests for block FMLA leave to bond with his newborn child.

70. Defendant committed interference and retaliation violations of the FMLA by: (1) terminating Plaintiff for requesting and/or exercising his FMLA rights; (2) by considering Plaintiff's FMLA leave needs in making the decision to terminate him; (3) terminating Plaintiff to intimidate him and/or prevent him from taking FMLA-qualifying leave in the future when

eligible; and (4) engaging in conduct which would discourage, dissuade and/or chill a reasonable person's desire to request and/or take FMLA leave.

71. These actions as aforesaid constitute violations of the FMLA.

## COUNT IV
### Violations of the New Jersey Family Leave Act (NJ FLA)
([1] Interference & [2] Retaliation)

72. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

73. Plaintiff would have been an eligible employee on or about May 20, 2025, while out on paternity leave following the birth of his child, under the definitional terms of the NJ FLA, N.J.S.A. § 34:11B-3(e).

74. Plaintiff informed Defendant, his employer, that he intended to take leave once he had been employed for at least twelve months pursuant to the requirements of N.J.S.A. § 34:11B-3(e).

75. Plaintiff had (or would have had) at least 1,000 hours of service with Defendant at the time he would have become eligible for FMLA leave for the birth of his child on or about May 20, 2025, pursuant to N.J.S.A. § 34:11B-3(e), had he not been terminated.

76. Defendant is engaged by a corporation that employs thirty (30) or more employees for each working day during each of the twenty (20) or more calendar workweeks in the current or proceeding calendar year, pursuant to N.J.S.A. § 34:11B-3(f)(4).

77. Plaintiff was entitled to receive leave pursuant to N.J.S.A. § 34:11B-4 for a total of twelve (12) work weeks of leave on a block or intermittent basis.

78. Defendant committed interference and retaliation violations of the NJ FLA by: (1) terminating Plaintiff for requesting and/or exercising his NJ FLA rights; (2) considering

Plaintiff's NJ FLA leave needs in making the decision to terminate him; (3) terminating Plaintiff to intimidate him and/or prevent him from taking NJ FLA-qualifying leave in the future; and (4) making negative comments and taking actions towards him that would dissuade a reasonable person from exercising his rights under the NJ FLA.

79.     These actions as aforesaid constitute violations of the NJ FLA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.     Defendant is to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B.     Defendant is to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority;

C.     Plaintiff is to be awarded punitive and/or liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D.     Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate including for emotional distress;

E.     Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

F.     Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

G.  Plaintiff's Plaintiff demands trial by jury on all issues so triable consistent with Fed. R. Civ. P. 38(a)(1).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____

Ari R. Karpf, Esq. (021842003)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
215-639-0801 (P)
215-639-4970 (F)
akarpf@karpf-law.com

Dated: December 4, 2025

14